Below is an opinion of the court.

_David W. Hercher_
DAVID W. HERCHER
U.S. Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re | |
| **Consolidated Estate of Former W2W Entities**, formerly known as Wall to Wall Tile & Stone, LLC (Case No. 19-32600), Wall to Wall Tile & Stone – Oregon LLC (Case No. 19-32599), and Wall to Wall Tile & Stone – Idaho LLC (Case No. 19-32603), | Case No. 19-32600-dwh7<br><br>MEMORANDUM DECISION AFTER TRIAL[1] |
| Debtors. | |
| **Amy Mitchell**, trustee, | Adv. Proc. No. 22-03042-dwh |
| Plaintiff, | |
| v. | |
| **Tyler Glenn Kruckenberg** and **Angela Kruckenberg** aka Angela Santiago, husband and wife, and | |

---

[1] This disposition is specific to this action. It may be cited for whatever persuasive value it may have.

Page 1 – MEMORANDUM DECISION AFTER TRIAL

## I.      Introduction

Amy Mitchell, the chapter 7 trustee of three related limited liability company debtors, filed this action to avoid and recover payments debtors made to or for the benefit of Tyler Kruckenberg and Angela Kruckenberg, now known as Angela Santiago.

The complaint names a third defendant, W2W Stone Holdings, LLC. Mitchell at first sought a judgment substantively consolidating W2W with debtors, but she abandoned that claim before trial.[2] So when I use the term "defendants," I refer to Kruckenberg and Santiago.

After trial, I determine that Mitchell may avoid and recover from Kruckenberg payments to him challenged as preferential and a payment made after the petition date without court approval. She may also avoid and recover fraudulent transfers made to Kruckenberg, Santiago, and both while debtors were insolvent, which was most of the four-year look-back period.

## II.     Background

### A.     *Main bankruptcy cases*

On July 16, 2019, voluntary chapter 11 petitions were filed by Wall to Wall Tile & Stone, LLC, a Washington LLC,[3] Wall to Wall Tile & Stone –

---

[2] ECF No. 60 at 2.
[3] Case No. 19-32600.

Oregon LLC, an Oregon LLC,[4] and Wall to Wall Tile & Stone – Idaho LLC, an Idaho LLC.[5] I will refer to them by their states of formation, as the Idaho, Oregon, and Washington debtors. Debtors operated out of locations in each of the three states.[6]

On April 6, 2020, the cases were converted to chapter 7, and Mitchell was appointed trustee.[7] On July 21, 2020, the three cases were substantively consolidated as of the petition date. All three debtors' assets and liabilities were "consolidated for the purposes of the bankruptcy cases."[8]

### B.    Complaint

The complaint has six claims for relief. The first, under 11 U.S.C. § 547, seeks to avoid from Kruckenberg allegedly preferential payments.[9] The second claim, under 11 U.S.C. § 544 and Oregon Revised Statutes § 95.240(1), seeks to avoid allegedly fraudulent transfers made by debtors during the four-year period before bankruptcy, beginning July 16, 2015.[10] The third claim, under 11 U.S.C. § 548, seeks to avoid the subset of allegedly fraudulent transfers made during the two-year period before bankruptcy.[11] The fourth claim, under 11 U.S.C. § 549, seeks to avoid and recover from

---

[4] Case No. 19-32599.
[5] Case No. 19-32603.
[6] Case No. 19-32600 ECF No. 16 at 2 ¶ 10.
[7] Case No. 19-32600 ECF No. 350.
[8] Case No. 19-32600 ECF No. 413 at 2 ¶¶ 2–3.
[9] ECF No. 1 at 18 ¶¶ 120–29.
[10] ECF No. 1 at 18–19 ¶¶ 130–34.
[11] ECF No. 1 at 19 ¶¶ 135–36.

Kruckenberg a postpetition transfer to him.[12] The fifth claim, under

11 U.S.C. §§ 550 and 551, seeks to recover and preserve the avoided

transfers.[13] The complaint requests that Kruckenberg and Santiago be held

jointly and severally liable for the fraudulent transfers. The sixth claim—

since abandoned by Mitchell—sought substantive consolidation of W2W into

debtors' consolidated estate.[14]

## C.    *Summary judgment*

Before trial, Mitchell sought summary judgment for most of the amounts

she seeks in her complaint. On the first claim, she sought summary judgment

against Kruckenberg for the allegedly preferential payments, which total

$60,000.[15] On the second and third claims, for fraudulent-transfer avoidance,

she sought partial summary judgment for the payments in and after 2016.[16]

On the fourth claim, she sought summary judgment avoiding the postpetition

transfer of $21,391.56.[17] On the fifth claim, she sought recovery and

preservation of the avoided transfers.[18]

I granted Mitchell summary judgment on one of two preference payments

and the postpetition payment. I granted her partial summary judgment that

(1) the second preference payment had been made and (2) all the alleged

---

[12] ECF No. 1 at 19 ¶ 137.
[13] ECF No. 1 at 20 ¶¶ 142–46.
[14] ECF No. 1 at 20–21; ECF No. 60 at 2.
[15] ECF No. 31 at 2.
[16] ECF No. 31 at 2.
[17] ECF No. 31 at 2.
[18] ECF No. 31 at 2.

fraudulent transfers had been made and that most had been for less than reasonably equivalent value. But I did not determine that debtors had been insolvent.

## III.    Discussion

### A.    *Statutory jurisdiction and constitutional authority*

The district court has jurisdiction over this action, a civil proceeding arising in this case, under 28 U.S.C. § 1334(b). The district court has referred to this court all bankruptcy cases and proceedings in this district.[19] This action is a core proceeding 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O), which this court may hear and determine.[20]

In the complaint, Mitchell consented to entry of final orders or judgment by this court.[21] In a stipulated amended scheduling order, Mitchell and defendants consented to "this Court's jurisdiction under LBR 7012-1." Under that rule (which has since been repealed), a responsive pleader's failure to timely state whether the pleader consents to the bankruptcy judge's entry of final orders or judgment "waives any objection to the judge's entry of final orders or judgment." Because both defendants agreed to the scheduling order, I will treat their consent as affirmative.

---

[19] LR 2100-2(a)(1).
[20] 28 U.S.C. § 157(b)(1).
[21] ECF No. 1 at 2 ¶ 5.

## B. *Trial evidence*

In the scheduling order, I ordered the parties to file exhibit lists by November 3, 2023.[22] I set a final pretrial conference for November 13[23] and ordered that authenticity or hearsay objections to exhibits be made at or before that conference and that, absent objection, "the exhibits will be deemed admitted at trial."[24]

Mitchell timely filed her exhibit list,[25] and I held the final pretrial conference as scheduled. Kruckenberg filed his witness list on November 21.[26] I granted Mitchell's November 20 motion to exclude documentary evidence offered by either defendant "that was not disclosed in an exhibit . . . list submitted [by] the offering party," unless offered for impeachment.[27] Neither defendant objected to Mitchell's exhibits. Under the scheduling order and the order on Mitchell's motion, her filed exhibits were admitted for all purposes, and Kruckenberg's were admitted for impeachment.

With Kruckenberg's consent, I granted Mitchell's motion to admit Santiago's declaration in evidence as her direct testimony and to permit her to testify by telephone.[28]

I heard testimony from Mitchell and defendants.

---

[22] ECF No. 29 at 2 ¶ G.a.
[23] ECF No. 29 at 4 ¶ K.
[24] ECF No. 29 at 4 ¶ M.
[25] ECF No. 48.
[26] ECF No. 72.
[27] ECF No. 75 at 2 ¶ 1.
[28] ECF No. 70.

### C. *Insolvency*

The insolvency of a debtor-transferor is an element of claims to (1) avoid a constructively fraudulent transfer under 544(b) and 95.240(1) or under 548 and (2) avoid an insider preference under 547.[29] For each transfer, the trustee must prove that the debtor was insolvent when the transfer was made or that the transfer rendered the debtor insolvent.

### 1. Substantive consolidation

### (a) *Summary judgment*

I determined for summary judgment that debtors' main-case substantive consolidation had not determined that they should be treated as one entity other than at and after the petition date.[30] And the evidence Mitchell submitted on summary judgment did not demonstrate that the debtors, treated as separate entities, were each insolvent throughout the look-back period.[31] I made that point for the 2016 and 2017 consolidated financial statement, but it applies equally to the 2018 and 2019 consolidated tax returns.

Because Mitchell had not shown which debtor had made each payment at issue, the summary-judgment record did not support a determination that any of the payments—including the allegedly preferential payment outside the 90-day period—was made by an insolvent debtor.

---

[29] 11 U.S.C. §§ 548(a)(1)(B)(ii)(I), 547(b)(3).
[30] ECF No. 44 at 10–11.
[31] ECF No. 44 at 19.

## (b)    *Trial*

At trial, Mitchell offered evidence that the three debtors should, at least from 2016, be treated as a single entity. She testified that management did not respect debtors' separate identities, and debtors kept a single set of books and records for the Washington debtor and none for the other two debtors.

Mitchell described information in debtors' schedules and SoFAs—all signed by Kruckenberg. Specifically, she said that—

- the first page of the schedules states that the assets are owned entirely by the Washington debtor and that the Idaho and Oregon debtors have no assets,

- the SoFAs state that the Idaho and Oregon debtors have no books or records, and "everything was run through the main entity," the Washington debtor,

- only three creditors are listed as creditors for all three debtors, and all other creditors are listed only as creditors of the Washington debtor.

- Kruckenberg said that "there were no accounts," which I took to mean bank accounts, other than accounts in the name of the Washington debtor.

According to Mitchell, other than creditors Wells Fargo Bank, Baffco Enterprises, LLC, and Cosmos Granite, for which the three debtors have joint and several liability, all other creditors have claims only against the Washington debtor. Debtors' inventory was tracked by its physical location, but none was recorded on debtors' books as owned by the Idaho or Oregon debtors.

Mitchell asked debtors' lawyers for debtors' operating agreements, but the lawyers did not produce any and told her they thought there were none.

Page 8 – MEMORANDUM DECISION AFTER TRIAL

All payments to creditors were made by the Washington debtor.

Defendants did not offer any specific, substantial evidence that debtors should not be treated as a single entity.

I find that the Washington debtor was the payor of each of the payments and that it owned all assets that debtors treated for any purpose, including financial or tax reporting, as owned by the Idaho and Oregon debtors. When I refer below to "debtors," I mean the Washington debtor with those attributes.

### (c)    *State law applicable to 544(b) claim*

When a federal court must determine which state's law applies to an issue governed by state law, the court applies the choice-of-law rules of the forum state.[32] Because this court sits in Oregon, it applies Oregon's choice-of-law rules. When an Oregon court addresses a choice-of-law problem, the threshold question is whether different states' laws conflict with each other.[33] If they do not, there is a "false conflict," and Oregon law applies.[34] The proponent of the law of a state other than Oregon must identify material differences between the applicable law of Oregon and of the other state.[35] Here, no party urged the application of law of any state other than Oregon.

Mitchell's second claim for relief seeks avoidance of fraudulent transfers under 544(b). Section 544(b)(1) permits the trustee to avoid a property

---

[32] Kohlrautz v. Oilmen Participation Corp., 441 F.3d 827, 833 (9th Cir. 2006).
[33] Machado-Miller v. Mersereau & Shannon, LLP, 43 P.3d 1207, 1209 (Or. App. 2002), citing Lilienthal v. Kaufman, 395 P.2d 543 (Or. 1964).
[34] *Machado-Miller*, 43 P.3d at 1209, quoting Angelini v. Delaney, 966 P.2d 223, 227 (Or. App. 1998).
[35] Waller v. Auto-Owners Ins. Co., 26 P.3d 845, 848 (Or. App. 2001).

transfer voidable "under applicable law" by an unsecured creditor. In the complaint, she alleges that the law applicable to her 544(b) claim is that of Oregon.[36] For summary judgment, I accepted her uncontradicted argument that, even though there was some uncertainty whether the relevant law is that of Idaho, Oregon, or Washington, the relevant law would not be materially different than that of Oregon.[37]

I adhere to that conclusion. Each of the three states where debtors were formed has enacted a version of the Uniform Voidable Transactions Act, replacing enactments of the Uniform Fraudulent Transfers Act. Both acts were promulgated by the Uniform Law Commission. Idaho enacted the UFTA in 1987[38] and replaced it with the UVTA in 2015, effective on July 1, 2015,[39] before the four-year look-back period began. Oregon enacted the UFTA in 1985[40] and replaced it with the UVTA in 2023, effective on January 1, 2024,[41] after the petition date. Washington enacted the UFTA in 1987[42] and replaced it with the UVTA in 2017, effective on July 23, 2017.[43] So the UVTA enacted in Idaho and the UFTA enacted in Oregon were in effect during the entire four-year look-back period, the UFTA enacted in Washington was in effect for

---

[36] ECF No. 1 at 19 ¶ 134.
[37] ECF No. 44 at 14.
[38] 1987 Idaho Sess. Laws ch. 202.
[39] 2015 Idaho Sess. Laws 1289.
[40] 1985 Or. Laws ch. 664.
[41] 2023 Or. Laws ch. 83.
[42] 1987 Wash. Sess. Laws ch. 444.
[43] 2017 Wash. Sess. Laws ch. 57.

roughly the first year and a half of that period, and the UVTA enacted in Washington was in effect for roughly the final two and one-half years.

In both uniform acts, section 5(a) permits a creditor to avoid a transfer made after the claim arose if the debtor did not receive reasonably equivalent value for the transfer, and the debtor was insolvent at the time or was rendered insolvent by the transfer.[44] Section 2(a) of both acts defines "insolvent" slightly differently. Under the UFTA, a debtor is insolvent if the sum of the debtor's debtors exceeds all the debtor's assets at a fair valuation.[45] That definition derived from the similar Bankruptcy Code definition.[46] Under the UVTA, a debtor is insolvent if, at a fair valuation, the sum of the debtor's debts exceeds the sum of the debtor's assets.[47] Section 4(a)(1) permits avoidance of a transfer made with actual intent to hinder, delay, or defraud any creditor of the debtor.[48] Section 9(a) extinguishes both a claim to avoid both a constructively fraudulent transfer and an actual-intent transfer unless an action is brought within four years after the transfer was made.[49]

---

[44] Idaho Code § 55-914(1) (2023); Or. Rev. Stat. § 95.240(1) (2019); Wash. Rev. Code § 19.40.051(a) (2016); Wash. Rev. Code § 19.40.051(1) (2022).
[45] Or. Rev. Stat. § 95.210(1) (2019); Wash. Rev. Code § 19.40.021(a) (2016).
[46] 11 U.S.C. § 101(32); UFTA § 2 Comment (1).
[47] Idaho Code § 55-911(1) (2023); Wash. Rev. Code § 19.40.021(1) (2022).
[48] Idaho Code § 55-913(1)(a) (2023); Or. Rev. Stat. § 95.230(1)(a) (2019); Wash. Rev. Code § 19.40.041(a)(1) (2016); Wash. Rev. Code § 19.40.041(1)(a) (2022).
[49] Idaho Code § 55-918(a) (2023); Or. Rev. Stat. § 95.280(a) (2019); Wash. Rev. Code § 19.40.091(a) (2016); Wash. Rev. Code § 19.40.091(1) (2022).

There is one nominal difference between the UFTA and the UVTA provisions at issue. Under 2(a) of the UVTA, but not the UFTA, the "fair valuation" requirement applies not only to assets but also to debts. But I am unaware of any principle that, under the UFTA, debts should be quantified other than at a "fair valuation." So there is no material difference, and thus no actual conflict, among the laws of Idaho, Oregon, and Washington applicable to the 544(b) claim, there is a "false conflict," and Oregon law applies.

## 2. Insolvency in 2016 and 2017

To demonstrate insolvency in 2016 and 2017, both for summary judgment and at trial, Mitchell relied on the balance sheet in debtors' 2016 and 2017 financial statements.[50] The financial statements are a single document containing several statements of debtors' financial condition for both years, including a balance sheet and accompanying notes. For clarity, I will refer to the document in the singular as the "financial statement."

The financial statement is for "Wall to Wall Tile and Stone, LLC" (the Washington debtor) "and Subsidiaries," and it is entitled "Consolidated Financial Statements." Debtors' reasons for consolidation appear in a statement note.[52] The statement uses the singular term "company" to refer to the Washington debtor, consolidated with the Idaho and Oregon debtors.

---

[50] ECF No. 33 at 12 ¶ 58, Ex. 8; ECF No. 73-2.
[52] ECF No. 33 at 12 ¶ 58, Ex. 8 at 9 n.1, Principles of consolidation; ECF No. 73-2 at 9 n. 1, Principles of consolidation.

Page 12 – MEMORANDUM DECISION AFTER TRIAL

Consistent with that usage in the statement, as well as my ruling in part III.C.1(b) above that the Washington debtor made all the payments and owned all assets treated as owned by the Idaho and Oregon debtors, I will use the terms "debtors," "Washington debtor," and "company" interchangeably.

Debtors' balance sheets show solvency of $755,619 on December 31, 2016, and $1,850,874 on December 31, 2017.[54]

### (a)  *Evidence of insolvency in 2016 and 2017*

At trial, Mitchell proposed several adjustments to the balance sheets, which if accepted would flip the nominal solvency for each date to insolvency.

### (1)  **Accounts receivable, net**

Mitchell first addressed the balance-sheet asset "accounts receivable, net." Net accounts receivable is accounts receivable minus retainages and allowance for doubtful accounts. Accounts receivable "are stated at the invoiced amount" without interest. The "Company provides an allowance for doubtful collections which is based upon a review of outstanding receivables, historical collection information, existing economic conditions and the specific circumstances of the Company's customers." And "[d]elinquent receivables"—those past due more than 90 days—"are written off based on individual credit evaluation of the customer after all collection avenues have been exhausted."[55] Net accounts receivable is the sum of accounts receivable and retainages minus an "[a]llowance for doubtful accounts."

---

[54] ECF No. 73-2 at 3, 5.
[55] ECF No. 73-2 at 10 n.1 Accounts receivable.

The sum of accounts receivable and retainages was $2,613,437 for 2016 and $2,710,159 for 2017. The doubtful-accounts allowance was $50,000 for 2016 and $71,000 for 2017.

According to Mitchell, "[i]t doesn't look like they had been necessarily writing [accounts receivable] off. . . . If you're looking at it from a perspective of having to collect those funds and reduce them to money, I'd think you'd have to at least consider a 10 percent reduction in that." She said that "it's hard to say how much of it was on the older side," and when debtors filed their petitions, "they had some accounts that were significantly past due, like at the time of conversion."

### (2)    Inventories, net

The second asset Mitchell addressed is "Inventories, net." Inventory is booked at "the lower of cost or net realizable value." Net inventories is the sum of hard-surface slabs, sinks, and supplies, minus the inventory reserve. Inventory reserves "are established to reflect situations in which cost of the inventory, principally stone slab remnants, is not expected to be recovered." In evaluating whether inventory reserves are adequate to stated inventory book value at the lower of cost or net realizable value, "management considers such factors as the condition of the inventory on hand, estimated waste factors, estimated time to sell the inventory and current and expected market conditions." The estimates supporting the reserve calculation can

change "as the condition of remnant inventories change and as consumer preferences change."[56]

Inventory was booked at $3,730,250 for 2016 and $10,326,368 for 2017. The reserve was $450,000 for 2016 and $377,000 for 2017.

According to Mitchell, debtors "had a large, large inventory of granite," even though, as Kruckenberg told her, "people had moved away from granite as their primary interest in countertops and moved towards quartz." She said that the inventory reserve was "fairly small." Debtors "were not taking into account the dramatically reduced value for those remnants." It "doesn't appear that there has been any meaningful reduction to represent the items that cannot be of realized value, . . . whether that's because they're remnants or . . . not a popular style anymore . . .." "[T]hey're valuing remnants the same as they're valuing the whole slab. . . .. [W]hatever . . . dollar per square foot that they would apply to the entire slab, they're applying that same amount based on the dollars per square foot to the remnants." She said that "[i]n terms of liquidation, . . . you're looking at least at a 10 percent cost to sell it . . .. [I]f you're going to look at the fair-market value, if we were going to liquidate this business at these points in time, I'd say you probably take off at least 25 to 30 percent of that stated value there in order to get to where you think you could recover funds."

---

[56] ECF No. 73-2 at 10 n.1 Inventories.

During Kruckenberg's cross-examination of Mitchell, he asked whether debtors would sell inventory "at cost or would it put a markup on it." She answered, "[w]e're talking about a liquidation analysis. We're not talking about the sales process. . . . We're talking about a liquidation value, not what would the company be able to or have to do to make this into more money."

### (3) Property and equipment, net

The third asset that Mitchell addressed is "Property and equipment, net." Property and equipment "are stated at cost, less accumulated depreciation and amortization."[57] Net property and equipment is the sum of the cost of equipment, vehicles, leasehold improvements, displays and samples, furniture and fixtures, and computers and software, minus accumulated depreciation and amortization. Property and equipment was booked at $8,010,447 for 2016 and $9,377,588 for 2017. Accumulated depreciation and amortization was $2,908,942 for 2016 and $4,599,202.[58] The statement does not allocate the depreciation and amortization amounts among the property and equipment components.

Mitchell separately addressed the values of each component of property and equipment: equipment, vehicles, leasehold improvements, displays and samples, furniture and fixtures, and computers and software. The equipment was mostly built-in and customized for the space, so it could not easily be moved. Most of the equipment for the Washington debtor had been bought in

---

[57] ECF No. 73-2 at 11 n.1, Property and equipment.
[58] ECF No. 73-2 at 14 n.5, Property and equipment.

2012 and 2013, and the other debtors bought equipment in 2016 and 2017. "Given the age of the equipment" and her other observations, she thought "you could take off 50 percent for the equipment . . . based on the purchase cost." Equipment was booked at $5,086,938 for 2016 and $5,853,629 for 2017.

Vehicles were booked at $1,410,153 for 2016 and $1,486,450 for 2017. Mitchell said debtors "had a lot of older trucks" that "take some beating." She thought "you could easily take off another 50 percent for the vehicles based off of their cost value."

Leasehold improvements are the cost of capital expenditures on leased locations, such as electrical upgrades to allow debtors to run their heavy equipment and putting in flooring and glass doors in their showrooms. Leasehold improvements were booked at $974,782 for 2016 and $1,109,959 for 2017. Because the leasehold improvements "are going to stay in the building" and "would not have any liquidation value," she "would discount that entirely in terms of liquidation."

Displays and samples are product samples that debtors provided in their showrooms. Displays and samples were booked at $293,737 for 2016 and $650,637 for 2017. Mitchell said that "[a] new company," presumably meaning one buying debtors' assets, "would probably get new samples from the vendor." She "would reduce the displays and samples by 75 percent to be conservative."

Page 17 – MEMORANDUM DECISION AFTER TRIAL

Furniture and fixtures are booked at $150,796 for 2016 and $175,459 for 2017. Mitchell said that debtors' furniture and fixtures were mostly office equipment and showroom furnishings, such as couches and rugs. Used office equipment has "very, very limited value . . . regardless of how nice it is or how new it is." She "would take at least 50 percent off . . . from cost."

Computers and software were booked at $94,041 for 2016 and $101,454 for 2017. Mitchell said that computers and software includes the capitalized cost of nontransferable software, which would have "no liquidation value." Used computers have no "real value from a liquidation standpoint," and she "would not give any value to the computers.

### (4)    Liabilities

Debtors' current liabilities include accounts payable, which were $4,877,397 for 2016 and $7,954,867 for 2017. And their other liabilities include a "legal contingency" of $1,500,000 for 2017, but none for 2016.[59]

Debtors explained the legal contingency in a financial statement note describing their dispute with "a supplier" of hard-surface countertop slabs. Mitchell identified the supplier as Cosmos. As part of that dispute, "[i]n June 2017, the Company ceased paying [Cosmos's] invoices" until the dispute could be resolved. Cosmos sued debtors for unpaid invoices totaling $5.1 million as of December 31, 2017. Debtors asserted contract-breach counterclaims against Cosmos, requesting damages exceeding $5.2 million.[60]

---

[59] ECF No. 73-2 at 5.
[60] ECF No. 73-2 at 17 n.8.

According to Mitchell, in 2016, debtors were still making payments, ordering actively, and paying Cosmos. There are journal entries for the final two quarters of 2016 with a reduction of $68,000 each quarter, saying that the adjustment is "for failure to meet price guaranty." She also said that debtors made a 2017 journal entry "and wiped out just about $3.1 million of the account payable to Cosmos." Debtors' dispute with Cosmos ended in October 2018 with debtors' agreement to pay Cosmos $5.5 million in installments. Debtors breached the installment obligation to Cosmos, resulting in entry of a $5.5 million judgment by confession shortly before bankruptcy.[61]

For those reasons, Mitchell said that the payable reductions of $136,000 in 2016 and $3.1 million in 2017 were unwarranted and should be reversed.

### (b) *Mitchell's proposed adjustments to 2016 and 2017 balance sheet*

The closing argument on behalf of Mitchell included the statement that the effect of her proposed asset reductions would be to reduce the 2016 total assets from "$12.4 million" to "$9.5, $9.6 million." The 2016 asset total is $12,399,836, which corresponds to the $12.4 million figure. I infer from Mitchell's testimony and closing argument that the specific asset adjustments she urges for 2016 and 2017 would—

- reduce net accounts receivable by the difference between 10 percent of gross accounts receivable ($258,504 for 2016 and $270,555 for 2017) and the allowance for doubtful accounts ($50,000 for 2016

---

[61] ECF No. 73-19.

and $71,000 for 2017), or a net of $208,504 for 2016 and $199,555 for 2017),

- reduce gross inventory (inventory without the inventory reserve) by 25 percent, or $820,065 for 2016 and $2,487,342 for 2017, but leave in place the reserve ($450,000 for 2016 and $377,000 for 2017),

- reduce equipment by 50 percent, or $2,543,469 for 2016 and $2,926,815 for 2017,

- reduce vehicles by 50 percent, or $705,077 for 2016 and $743,225 for 2017,

- reduce leasehold improvements by 100 percent, or $974,782 for 2016 and $1,109,959 for 2017,

- reduce displays and samples by 75 percent, or $220,303 for 2016 and $487,978 for 2017,

- reduce computers and software by 100 percent, or $94,041 for 2016 and $101,454 for 2017, and

- leave in place the property and equipment depreciation and amortization, $2,908,942 for 2016 and $4,599,202 for 2017.

The effect of those reductions would be to reduce assets to $9,667,167 for 2016 and $14,886,473 for 2017. The 2016 figure roughly corresponds to the "$9.5 million or $9.6 million" mentioned in closing argument.

### (c) *Analysis of proposed adjustments*

How the "fair value" of property is determined when calculating solvency depends on the context in which the valuation is made. In the Ninth Circuit's 1999 decision in *Wolkowitz v. Am. Research Corp. (In re DAK Indus., Inc.),* the court held that, before valuing an asset, "the [trial] court must determine whether a debtor was a 'going concern' or was 'on its deathbed.'"[62] ' If the

---

[62] 170 F.3d 1197, 1199 (9th Cir. 1999).

debtor was a going concern, "the court will determine the fair market price of the debtor's assets as if they had been sold as a unit, in a prudent manner, and within a reasonable time." But if "the company was on its deathbed, i.e., only nominally extant, then the court will determine the liquidation value of the assets, such as a price expected at a foreclosure sale."[63]

Here, Mitchell offered no evidence that, at any time before bankruptcy, debtors were on their deathbed or that bankruptcy was clearly imminent. So here, the fair valuation of debtors' assets is their value not in liquidation but on a going-concern basis, and her proposed asset reductions to reflect liquidation values do not reflect the fair valuation of those assets.

I accept Mitchell's justifications for her proposed reductions for "accounts receivable, net," and "inventories, net." Debtors failed to address uncollectible accounts. In explaining her proposed reduction in inventory, Mitchell did say "we're talking about a liquidation value," but her primary reason was debtors' failure to account for the proper value of remnants and out-of-fashion granite. The reductions of those assets are warranted without relying on their liquidation value.

But Mitchell's justifications for her proposed reductions to the components of "property and equipment, net" are either insufficiently explained or based on those assets' liquidation value. She said that equipment and leasehold improvements were unsalable because they were built-in and customized for

---

[63] *DAK*, 170 F.3d at 1199 n.3.

Page 21 – MEMORANDUM DECISION AFTER TRIAL

the leased space and thus could not be removed easily, if at all. And she said that displays and samples, furniture and fixtures, and computers and software had little or no value that debtors could have obtained by resale. But she did not explain why debtors' ownership of those items, even if unsalable, did not provide value to debtors by saving them the expense of replacing those items over their remaining useful life. To discount those items because they cannot be sold is another way of assigning them a liquidation value.

Mitchell's justifications for reducing equipment and vehicles includes the items' age and condition. But she did not explain why the amount of booked depreciation does not account for those items' physical depreciation.

Finally, Mitchell expressly justified her proposed reductions of leasehold improvements and computers and software as necessary to reflect liquidation value.

I accept Mitchell's testimony that debtors' accounts payable are understated and should be increased by $136,000 for 2016 and $3.1 million for 2017.

The balance sheets in debtors' 2016 and 2017 tax returns, which are among Mitchell's trial exhibits[64] but not relied on by any party, do not change my views above of debtors' financial condition based on the financial statement. The values assigned to asset categories in the tax balance sheets

---

[64] ECF No. 73-2.

cannot be reconciled with those in the financial statement. And the tax balance sheets show debtors having positive "shareholders' equity" at the beginning and end of both years.[65]

Accepting Mitchell's proposed reductions in the balance-sheet accounts receivable and inventory and her proposed increase in accounts payable, debtors' adjusted net worth is reduced by $1,164,569 for 2016 and $5,786,897 for 2017, resulting in net worth of negative $408,950 for 2016 and negative $3,936,023 for 2017.

### (d) *Debtors' financial condition throughout 2016 and 2017*

Although a balance sheet is a "snapshot" of assets and liabilities at the end of a financial period,[66] I take Mitchell to suggest that, based on the adjusted balance sheet showing insolvency on the last days of each of 2016 and 2017, I should infer insolvency for each day of those years.

In avoidance actions, courts have inferred a debtor's financial condition based on evidence as of a date other than the date of a challenged transfer. In 1976, the Ninth Circuit held in *Misty Management Corp. v. Lockwood*[67] that inferring a debtor's insolvency on a transfer date based on evidence of the debtor's later condition—which it called "retrojection"—was "permissible insofar as care is taken to account for all changes in financial position between the date of the financial statement and the date upon which

---

[65] ECF Nos. 73-6 at 4, 73-8 at 4.
[66] Bolt v. Merrimack Pharms, Inc., 503 F.3d 913, 914 (9th Cir. 2007).
[67] 539 F.2d 1205, 1213 (9th Cir. 1976).

insolvency is in question." For that proposition, the Ninth Circuit cited a 1971 First Circuit decision,[68] which in turn cited a 1964 decision of that court, *Hassan v. Middlesex County National Bank*.[69] Under *Hassan*, before a court may rely on retrojection, "the trustee must be able to show the absence of any substantial or radical changes in the assets or liabilities of the bankrupt between the retrojection dates." That holding from *Hassan* was quoted with approval in a 1967 Fifth Circuit decision describing retrojection as "a back-up method" of insolvency proof.[70]

Reported appellate decisions addressing retrojection have not prescribed general rules about when retrojection is appropriate. *Misty Management* is an example of a decision affirming a trial court's application of retrojection; the Ninth Circuit relied in part on the balance sheet showing insolvency that the debtor filed with its bankruptcy petition six months after the challenged transfer.[71] By contrast, in the Sixth Circuit's 1981 decision in *John Ownbey Co., Inc. v. C.I.R.*,[72] a fraudulent-transfer avoidance action, the court found reversible error in a trial court's assumption that a debtor was insolvent "many months" before the date as of which the plaintiff sought to prove

---

[68] Braunstein v. Massachusetts Bank & Tr. Co., 443 F.2d 1281 (1st Cir. 1971).
[69] 333 F.2d 838, 840–41 (1st Cir. 1964).
[70] Haynes & Hubbard, Inc. v. Stewart, 387 F.2d 906, 907 n.1 (5th Cir. 1967).
[71] *Misty Management*, 539 F.2d at 1213.
[72] 645 F.2d 540, 546 (6th Cir. 1981).

Page 24 – MEMORANDUM DECISION AFTER TRIAL

insolvency, "especially . . . where, as here, the transferor throughout the year was a going concern whose assets and liabilities changed as it did business."

Here, based on debtors' insolvency at the end of both 2016 and 2017, I infer that they were insolvent from December 31, 2016, through December 31, 2017.

But whether debtors were insolvent before December 31, 2016, is a different question. The 2016 payments Mitchell seeks to avoid were made throughout the year, beginning January 1. These payees were paid before December 31:

- Farmers was paid from January 25 through December 22[73]
- Kruckenberg was paid from January 1 through December 30[74]
- Personal-expense vendors were paid from January 12 through December 23[75]
- Pro Caliber was paid from March 17 through December 27[76]
- Santiago (nominally) was paid from February 5 through December 30[77]
- Tax agencies were paid from April 13 through November 30[78]

To find that all the 2016 payments were made while debtors were insolvent, I would need to conclude that debtors were insolvent from and after January 1. But I have no evidence of debtors' insolvency before

---

[73] ECF No. 73-11.
[74] ECF No. 73-15.
[75] ECF No. 73-12.
[76] ECF No. 73-10.
[77] ECF No. 73-13.
[78] ECF No. 73-16.

Case 22-03042-dwh    Doc 85    Filed 03/27/24

December 31, 2016, and I have affirmative evidence of their solvency on January 1 in the form of the financial statement note that debtors' "members' equity" (the amount of nominal solvency) was then $1,873,722[79]–more than twice the nominal net worth amount at the end of 2016 and more than the net worth reduction of $1,164,569 that I have accepted for December 31.

If the only 2016 payments at issue had been made on December 30, or even throughout December, whether I should "retroject" insolvency from December 31 would be a close question. But here the payments were made throughout 2016; I have evidence of insolvency on January 1; and I have no evidence of when during that year they became insolvent. Nor do I have evidence that debtors were not, in the words of *John Ownbey*, "going concern[s] whose assets and liabilities changed as [they] did business." The trial record here lacks evidence that, in the words of *Misty Management*, "care [has been] taken to account for all changes in financial position between the date of the financial statement and the date upon which insolvency is in question" or that, in the words of *Hassan*, there were no "substantial or radical changes in the assets or liabilities of" debtors throughout 2016. I am left with no principled basis for drawing the insolvency line anywhere before December 31.

[79] ECF No. 73-2 at 7.

I conclude that debtors were insolvent on and after December 31, 2016, but not before. Because none of the payments was on that date, for convenience I will describe the period of insolvency as from and after 2017.

### 3.     Insolvency in 2018 and 2019

Mitchell testified that for 2018 and 2019, "debtors' own financial records show insolvency on the face." Based on that testimony and evidence of insolvency at the end of 2017, I infer that debtors were insolvent during 2018 and 2019.

### D.     *Fraudulent transfers*

### 1.     Constructively fraudulent transfers

Mitchell sought summary judgment that payments made to or for the benefit of defendants are avoidable and recoverable as fraudulent transfers. Although the complaint seeks recovery of payments made throughout the four-year period, Mitchell sought, both on summary judgment and at trial, to recover only the subset of payments made in and after 2016.

### (a)     *Transfers for which lack of reasonably equivalent value was established at summary judgment*

I determined at summary judgment that debtors did not receive reasonably equivalent—or any—value for payments to or for the benefit of Kruckenberg totaling $579,088.09 and to or for the benefit of both defendants totaling $933,211.86.[80] As Mitchell correctly noted in her trial brief,[81] I

---

[80] ECF No. 44 at 15–16.
[81] ECF No. 60 at 4 n.1.

mistakenly totaled the amounts paid to or for the benefit of Kruckenberg alone; the correct sum is $579,088.09.

Because I have found that debtors were insolvent in and after 2017, the payments avoidable as constructively fraudulent are those made in that period. For some payments made during insolvency, the trial record includes lists of the dates and amounts of payments during the insolvency period. Those are the payments to Farmers Insurance,[82] Kruckenberg,[83] Pro Caliber Motorsports,[84] and (nominally) Santiago.[85] Those lists permit calculation of total payments to those payees during the insolvency period.

### (1) Payments to or for the benefit of Kruckenberg alone

For payments to Farmers and Pro Caliber, the complaint seeks avoidance of amounts paid during the entire look-back period, net of amounts Mitchell received from those payees in settlement of her avoidance and recovery claims against them for the same payments.[86] At summary judgment, she sought recovery of payments in and after 2016, which is a subset of payments at issue in the complaint. There, she acknowledged that her recovery should be net of the same settlement payments alleged in the complaint. I agreed with her, and found as the basis for my ruling, that as to Farmers, debtors paid $21,598.58, she received in settlement $17,619, and her net claim is

---

[82] ECF No. 73-11.
[83] ECF No. 73-5.
[84] ECF No. 73-10.
[85] ECF No. 73-4.
[86] ECF No. 1 at 7–8 ¶ 55–56 (Pro Caliber), at 8 ¶¶ 64–65 (Farmers).

$3,979.58,[87] and as to Pro Caliber, debtors paid $40,133.34, she received in settlement $29,227, and her net claim is $10,906.34.[88]

That Mitchell's claims should be reduced by the amounts she received in settlement from initial transferees is consistent with 550(d), which limits a trustee to "a single recovery" of an avoided transfer. But that limitation requires a credit against the trustee's avoidance-recovery claim against a defendant only to the extent that the trustee's recovery from someone else is on account of the transfer that the trustee seeks to recover from the defendant. Had I determined that she could avoid all the payments alleged in the complaint, including those in 2015, there would be no question that the recovery would have to be net of the amounts of the settlement payments. That's because the settlement payments, although not equal to the full amount of the avoidable payments, would have been on account of the all the avoidable payments.

But I have decided that the avoidable payments are only those made in and after 2017, so the avoidable payments are only a subset of those on account of which Mitchell received settlement payments. The credits for the settlement payments should not exceed the amount necessary to limit her to a single recovery of the avoided transfers. In other words, the credits should

---

[87] ECF No. 33 at 9 ¶ 42; ECF No. 44 at 15.
[88] ECF No. 33 at 8 ¶ 37; ECF No. 44 at 15.

Case 22-03042-dwh    Doc 85    Filed 03/27/24

be limited to the portions of the settlement payments attributable to the avoided payments.

For Farmers, the settlement payment of $17,619 is 82 percent of the 2016-and-after payments of $21,598.58, so the portion of the settlement payment attributable to the insolvency-period payments of $14,979.11 should be the same 82 percent of the insolvency-period payments, or $12,219.18, leaving a net avoidable amount of $2,759.93. And for Pro Caliber, the settlement payment of $29,227 is 73 percent of the 2016-and-after payments of $40,133.34, so the portion of the settlement payment attributable to the insolvency-period payments of $21,909.32, is the same 73 percent of the insolvency-period payments, or $15,955.41, leaving a net avoidable amount of $5,953.91.

Of the payments I determined at summary judgment had been paid directly to Kruckenberg, those during insolvency period total $89,819.60.

### (2) Payments benefiting both defendants

At summary judgment, I determined that debtors did not receive reasonably equivalent value for payments of defendants' personal expenses totaling $242,004.35[89] and their taxes totaling $691,247.51,[90] for a grand total of $933,251.86. During the insolvency period, the personal-expense

---

[89] ECF No. 44 at 6.
[90] ECF No. 44 at 7.

payments total $200,640.04,[91] and the tax payments total $503,497.60,[92] for a grand total of $704,137.64.

### (b) *Other transfers*

### (1) **Payments nominally to Santiago alone**

I determined at summary judgment that, in and after 2016, debtors paid Santiago $279,828.72,[93] but I did not find that debtors had received less than reasonably equivalent value for those payments.

In Santiago's declaration, she roughly accounts for the payments Mitchell alleged Santiago had received. Santiago says she received regular paychecks of $1,700 every two weeks for services "through October 20, 2017," "two paychecks of $1,398.40, on Nov. 3 and Nov. 17, 2017," and a check for $4,195.44 on March 5, 2018, which she says total $64,792.24.[94] She also lists payments from February 5, 2016, through June 7, 2019, in multiples of $1,000, from $5,000 to $10,000, totaling $219,000. She says the $219,000 "must have been deposited into a joint checking account that Tyler [Kruckenberg] controlled," and she does "not know where that money went, and I certainly do not have it now."[95]

---

[91] ECF No. 73-12.
[92] ECF No. 73-16.
[93] ECF No. 44 at 7, 15.
[94] ECF No. 73-17 at 3 ¶ 15.
[95] ECF No. 73-17 at 4 ¶ 20, Ex. A.

Page 31 – MEMORANDUM DECISION AFTER TRIAL

The payments that Santiago lists as totaling $219,000 are identifiable in Mitchell's Exhibit 13, which lists payments comprising the $279,828.72 that Mitchell claimed at summary judgment had been paid to Santiago.[96]

At trial, Mitchell withdrew her request for judgment against Santiago on account of any of the payments totaling $279,828.72 that Mitchell had said that Santiago alone received (but not the $933,211.86 that Mitchell alleges debtors paid for defendants' joint benefit). And Mitchell seeks recovery of the $219,000 from Kruckenberg. That position aligns with Mitchell's in the complaint and summary-judgment motion, where she sought recovery of all alleged fraudulent transfers from both defendants.[97] At summary judgment, I rejected Mitchell's argument that defendants had joint liability for all the fraudulent transfers, finding that the summary-judgment evidence supported holding only Santiago liable for the payments alleged to have been made only to Santiago. I was not asked then to decide that Kruckenberg was immune from liability for the payments nominally made to Santiago. About 15 days before trial, Mitchell filed and served her motion for admission at trial of Santiago's declaration—the evidentiary basis for finding that the payments totaling $219,000 were received not by Santiago, but by Kruckenberg.[98]

---

[96] ECF No. 33 at 9¶ 47 Ex. 4.
[97] ECF No. 1 at 4 ¶ 19, at 11 ¶ 70, at 22 ¶¶ B, G; ECF No. 31 at 2 ¶ 2.
[98] ECF No. 58.

Mitchell's trial brief, filed and served at the same time, asked that Tyler be held liable for those payments.[99]

I credit Santiago's declaration testimony that she did not receive the $219,000 paid nominally to her, and I find that Kruckenberg alone received that amount. The portion of that amount paid during the insolvency period is $165,000.[100]

### (2)     Payments to Bafford

At trial, Mitchell sought to avoid payments debtors made to Howard Bafford, for which she had not sought summary judgment. Defendants acknowledged that they leased their residence from Bafford, and Mitchell testified that debtors made the lease payments to him. That evidence shifted to defendants the burden of proving that debtors received reasonably equivalent value for the lease payments. Santiago testified that the residence was used for business-related entertaining, including parties at which 90 percent of guests were debtors' employees and, as a result, debtors received value for making the lease payments. But I have no evidence of the portion of the lease payments that are attributable to use of the residence for business purposes benefitting debtors. I thus find that debtors received no value for the Bafford payments.

Mitchell said that the payments to Bafford had been "summarized in Exhibit B to the complaint" and that the gross amount she seeks to recover is

---

[99] ECF No. 60 at 2 ¶ 4.
[100] ECF No. 73-13.

Page 33 – MEMORANDUM DECISION AFTER TRIAL

$210,000. That amount is the total of the payments listed in complaint Exhibit B as having been made in and after 2016.[101] She also said that in a main-case settlement with Bafford, the estate had received value in the form of a reduction of a claim by a Bafford-related company, Baffco Enterprises, LLC,[102] of which she treats the net amount of $115,000 as a partial recovery of the lease payments. She thus seeks to avoid the net amount of $95,000 ($210,000 minus $115,000) on account of the Bafford payments.

For the reasons explained above regarding the settlement payments from Farmers and Pro Caliber, the Bafford settlement payment is only partly attributable to the Bafford payments I have found to be avoidable. The settlement payment of $115,000 is 55 percent of the 2016-and-after payments of $210,000, so the portion of the settlement payment attributable to the insolvency-period payments of $150,000 should be the same 55 percent of the insolvency-period payments, or $82,142.86, leaving a net avoidable amount of $67,857.14.

### (c)   *Existence of unsecured creditor*

Section 544(b)(1) requires that an actual, not hypothetical, creditor be able to avoid the challenged transfer under applicable nonbankruptcy law.[103]

As I noted in part III.C.2(a)(4) above, Cosmos was a supplier to debtors of countertop slabs; in 2016, debtors were making payments, ordering actively,

---

[101] ECF No. 1 at 4 ¶ 24, Ex. B.
[102] No. 19-32600 ECF No. 528.
[103] Zazzali v. United States of America (*In re* DBSI, Inc.), 869 F.3d 1004, 1009 (9th Cir. 2017).

Page 34 – MEMORANDUM DECISION AFTER TRIAL

and paying Cosmos; debtors made a 2017 journal entry reducing but not eliminating their debt to Cosmos; debtors agreed in 2018 to pay Cosmos; and a judgment for Cosmos was entered in 2019, shortly before bankruptcy. I infer from those events, and Cosmos's filed proof of claim,[104] that Cosmos was a creditor at the time of each of the otherwise avoidable fraudulent transfers, which occurred in and after 2017. I have no evidence that Cosmos was other than an unsecured creditor. It could have sought under 95.240(1) to avoid the payments that Mitchell seeks to avoid as fraudulent transfers.

The actual-creditor requirement is satisfied.

### (d) *Summary of avoidable constructively fraudulent transfers*

The sum of the avoidable constructively fraudulent transfers to or for the benefit of Kruckenberg alone is $331,390.59. That amount is the sum of payments—

- To Bafford of $67,857.14,
- To Farmers of $2,759.93,
- To Kruckenberg of $89,819.60,
- To Pro Caliber of $5,953.91, and
- To Santiago nominally, but actually to Kruckenberg, of $165,000.

The sum of the avoidable constructively fraudulent transfers to or for the benefit of both defendants is $704,137.64.

---

[104] Claim 47-1.

### 2. Actual-intent fraudulent transfers

I denied Mitchell's request for summary judgment that all the allegedly fraudulent transfers are avoidable under the alternative theory that debtors made them with actual intent to hinder, delay, or defraud creditors.[105] Of the reasons I gave for that denial, the only one affected by the trial evidence is that I was unable at summary judgment to determine that debtors were insolvent or rendered insolvent. My trial finding of insolvency supports avoidance only of the insolvency-period payments, which I have already determined to be constructively fraudulent. So the insolvency evidence adds nothing to Mitchell's actual-intent argument.

I adhere to my summary-judgment conclusion that the evidence does not support a finding of actual intent.

### 3. Section 548 claim

Section 548(a)(1)(B) permits avoidance of constructively fraudulent transfers within two years before bankruptcy. Because the two-year period started July 16, 2017, it is a subset of the period from and after January 1, 2017, for which I have found the transfers to be avoidable under 544(b). So no purpose is served by addressing avoidance under 548 on top of 544(b).

### E. *Preferences*

On Mitchell's motion for summary judgment on her preference claim, I decided that she may avoid $5,000 paid on June 19, 2019.[106] That payment

---

[105] ECF No. 44 at 20–22.
[106] ECF No. 44 at 13; ECF No. 45 at 2 ¶ 1.a.

was made within 90 days before bankruptcy, when insolvency is presumed. And I ruled that $55,000 paid on February 11, 2019, outside the 90-day period, is avoidable upon proof of insolvency.[107]

Having determined at trial that debtors were insolvent in 2019, Mitchell may avoid the $55,000 payment as well.

### F.    *Postpetition transfer*

I granted Mitchell summary judgment avoiding $21,391.56 paid to Kruckenberg after the petition date.[108]

### G.    *Recovery and preservation of avoided transfers*

Under 550(a)(1), the trustee may recover property the transfer of which has been avoided, or the value of the property, from the initial transferee or the entity for whose benefit the transfer was made. So the value (amount) of payments I have found to be avoidable may be recovered by Mitchell from the relevant defendant, or both of them, either as the initial transferee or the entity for whose benefit the transfer was made. Recovery is effected by entry of a money judgment against the liable defendant.

Under 551, an avoided transfer is preserved for the estate's benefit "but only with respect to estate property." Preservation, as distinct from recovery, appears to be meaningful only when the transfer is of noncash property or a lien on it. Here, the avoided transfers are of cash. In any case, preservation is automatic and does not require court action other than avoidance.

---

[107] ECF No. 44 at 13; ECF No. 45 at 2 ¶ 1.b.
[108] ECF No. 44 at 23.

**IV.    Conclusion**

Mitchell may avoid payments to or for the benefit of Kruckenberg totaling $412,782.15, which is the sum of $60,000 for preferences, $331,390.59 for fraudulent transfers, and $21,391.56 for the postpetition transfer. And she may avoid fraudulent transfers to or for the benefit of both defendants totaling $704,137.64. She may have judgment against defendants to recover those amounts. The judgment against both defendant will be joint and several. The judgment will also dismiss the claim against W2W Stone Holdings, LLC.

I will prepare and enter a separate judgment.

### # #

cc:    Tyler Glenn Kruckenberg
       Angela (Kruckenberg) Santiago
       W2W Stone Holdings, LLC